J-A11021-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1986 EDA 2021 |

Appeal from the Order Entered September 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0072825-2008

| | | |
|---|---|---|
| IN THE INTEREST OF: A.F.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1987 EDA 2021 |

Appeal from the Decree Entered September 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000472-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: C.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1988 EDA 2021 |

Appeal from the Order Entered September 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000695-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: C.A.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1989 EDA 2021 |

Appeal from the Decree Entered September 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000474-2019

| | | |
|---|---|---|
| IN THE INTEREST OF: T.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: L.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1990 EDA 2021 |

Appeal from the Order Entered September 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000696-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: T.A.R., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1991 EDA 2021 |

Appeal from the Decree Entered September 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000473-2019

J-A11021-22

| IN THE INTEREST OF J.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| APPEAL OF: L.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1992 EDA 2021 |

Appeal from the Order Entered September 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-DP-0000697-2016

| IN THE INTEREST OF: J.A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.S.P., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1993 EDA 2021 |

Appeal from the Decree Entered September 1, 2021
In the Court of Common Pleas of Philadelphia County Juvenile Division at
No(s): CP-51-AP-0000475-2019

BEFORE: BOWES, J., STABILE, J., and McLAUGHLIN, J.

MEMORANDUM BY BOWES, J.: **FILED AUGUST 8, 2022**

L.S.P. ("Mother") appeals from the September 1, 2021 decrees that terminated involuntarily her parental rights to her four children: A.S., born in September 2007; J.S., born in February 2009; T.R., born in June 2010; and

- 3 -

C.R., born in November 2012,[1] as well as the orders entered the same date that changed each child's permanent placement goal to adoption.[2] We affirm.[3]

Mother has a lengthy history with the Philadelphia Department of Human Services ("DHS"), which began in 2008 with a general protective services ("GPS") report as to A.S. regarding, *inter alia*, inadequate shelter, clothing, food, hygiene, supervision, and education. In March 2015, Mother pled guilty to five counts of endangering the welfare of her children based on the conditions of her home. In February 2016, DHS received a GPS report regarding concerns with inadequate hygiene and food, as well as substance

_____

[1] The captions use two different conventions for each child's initials. Within this memorandum, we use only the first and last initial for each child.

[2] The trial court entered separate decrees terminating the rights of the father of A.S. and J.S. He has not appealed to this Court. The trial court also entered separate termination decrees as to the father of T.R. and C.R. ("Father"). Father has filed appeals in this Court at 1994 EDA 2021, 1995 EDA 2021, 1996 EDA 2021, and 1997 EDA 2021.

[3] DHS submits that Mother waived her goal change issues by failing to include them in her brief. **See** DHS's brief at 55. Mother claims that she argued in her brief that "DHS's failure to meet its evidentiary burden was a flaw common to both sets of [p]etitions" and therefore her goal change issues are not waived. Mother's reply brief at 26-27 (quoting Mother's brief at 36). Mother's citation to her initial brief references a single sentence in the summary argument section. However, the argument section does not develop any grounds in support of the appeals from the goal change orders. Since Mother's brief has abandoned any argument in support of the appeals from the goal change orders, we affirm those orders without further discussion. **See Commonwealth v. Heggins**, 809 A.2d 908, 912 n.2 (Pa.Super. 2002) (citation omitted) ("[A]n issue identified on appeal but not developed in the appellant's brief is abandoned and, therefore, waived.").

use by Mother. In March 2016, DHS removed all four children from the home. They were adjudicated dependent and placed in the care of DHS.

Since 2016, Mother's single case plan objectives were, *inter alia*, to visit the children pursuant to court order, maintain contact with the Community Umbrella Agency ("CUA") assigned to the family, cooperate with case planning, maintain and occupy stable housing and assure the home is appropriate for children, comply with all court-ordered services, enroll in mental health services and comply with recommendations of the parenting capacity evaluation ("PCE"), sign all releases, and maintain and demonstrate appropriate hygiene for her home and children. N.T., 7/11/19, at 109. Mother's PCE was completed in June 2017. It recommended weekly individual therapy for Mother to understand the chronic neglect of her children, as well as her issues with substance use and domestic violence, and to explore the distortions leading to those issues to build the ability to parent her children safely. N.T., 1/19/21, at 81-82. According to Mother, she was unable to receive mental health services until January 18, 2019, due to insurance issues. *Id*. at 121-22; N.T., 8/10/21, at 54-55.

T.R. and C.R. were reunified with Father from August 2017 to May 2018, with the condition that Mother would not have unsupervised contact with them. Upon learning that Father, T.R., and C.R. were living with Mother, DHS

again took custody of T.R. and C.R. and they were re-adjudicated dependent and placed into care.[4]

On June 26, 2019, DHS filed petitions to terminate the parental rights of Mother as to all four children pursuant to 23 Pa.C.S. § 2311(a)(1), (2), (5), and (8). DHS also sought to change each child's permanency goal to adoption. The trial court held hearings on these petitions on July 11, 2019, January 17, 2020, January 19, 2021, March 15, 2021, and August 10, 2021.[5] With respect to Mother's petitions, DHS presented the testimony of J.A., foster mother to J.S. and the initial foster mother to A.S.; K.J., foster father to T.R. and C.R.; Joanna Pecora and Samir Ismail,[6] the CUA case managers; Dr. Erica Williams,

---

[4] All four children are in pre-adoptive homes. A.S. and J.S. initially resided in the same foster home together from August 2017 through the time of the termination hearings, where J.S. remains. In July 2020, during the pendency of the hearings, A.S. was removed due to an incident and now resides in a treatment-level foster home. T.R. and C.R. have resided in the same foster home together since they re-entered care in 2018.

[5] In addition to the goal change and termination hearings for A.S., J.S., T.R., and C.R., the trial court simultaneously held a permanency review hearing for an older sibling, K.W., who is not a party to this appeal. At the hearings, Emily Blumenstein, Esquire, represented all four children as guardian *ad litem* ("GAL") and Michael Graves, Esquire, represented them as legal counsel. While Attorney Graves sought to have his appointment vacated within thirty-one days following the termination of Mother's parental rights, see N.T., 9/1/21, at 13-14, the docket does not include an order vacating Attorney Graves's appointment and he still appears as legal counsel of record. We note with displeasure that Attorney Graves did not file a brief with this Court but note that the Defender Association of Philadelphia did file a brief on behalf of the children with this Court.

[6] The record occasionally spells Mr. Ismail's name as "Ishmael." ***See, e.g.***, N.T., 11/5/20; N.T., 8/10/21; N.T., 9/1/21. Mother asserts that the trial
*(Footnote Continued Next Page)*

who performed Mother's PCE; and Deanna Compton, the visitation coach. Mother testified on her own behalf, as did Father.

After taking the matters under advisement, the trial court issued decrees terminating Mother's parental rights as to A.S., J.S., T.R., and C.R. pursuant to § 2511(a)(1), (2), (5), (8), and (b), as well as separate orders changing each child's permanency goal to adoption. Mother filed timely notices of appeal and concise statements pursuant to Pa.R.A.P. 1925(a)(2). The trial court filed a single responsive Rule 1925(a) opinion. This Court consolidated the appeals *sua sponte*. Mother presents the following issues:

> 1. Can parental rights be terminated based on a petition, bench ruling, and written order that fail to assert any specific facts justifying termination, depriving the parent of notice as to the nature of the case against her?
>
> 2. Do the facts found by the trial court support its ruling that grounds existed under 23 Pa.C.S. §§ 2511(a)(1), (a)(2), (a)(5), (a)(8), or (b) to terminate [Mother's] parental rights for each of the Children by clear and convincing evidence?
>
> 3. Do the facts found by the trial court support by clear and convincing evidence its ruling that reunification was inviable and that the best interests of each of the Children would be advanced by terminating [Mother's] parental rights and by changing their permanency goal to adoption?
>
> 4. Did the trial court improperly rely upon facts outside the record?

---

court's usage of "Ishmael" in its Rule 1925(a) opinion demonstrates an error by the court as to "the basic facts of the case" which, in combination with other alleged factual errors, should prompt this Court to conclude "the trial court's findings are at too great a risk of error to satisfy the clear and convincing standard." Mother's reply brief at 12 n.5 (cleaned up). We decline to elevate a benign spelling error to such a level of error.

5. Were the Children deprived of adequate counsel?

Mother's brief at 4-5.

We address Mother's final claim first as "the vindication of [a child's] right to counsel under [23 Pa.C.S.] § 2313(a) is dispositive[.]" **Interest of D.N.G.**, 230 A.3d 361, 365 (Pa.Super. 2020). Our Supreme Court has held that § "2313(a) requires the appointment of counsel who serves the child's legal interests in contested, involuntary [termination] proceedings." **In re Adoption of L.B.M.**, 161 A.3d 172, 180 (Pa. 2017) (plurality).

While Mother frames this issue as to all four children, her argument focuses solely on the legal representation provided to C.R. and T.R. Specifically, Mother contends that Attorney Graves failed to ask questions, present evidence, or offer significant argument concerning C.R.'s "consistent oppos[ition to] adoption throughout the proceedings" and, despite "the record disclos[ing] evidence that both" T.R. and C.R. expressed a desire to return to the home and care of Mother and Father "at times," Attorney Graves argued that C.R. wanted permanent legal custody "and made no argument whatsoever as to [T.R.]" Mother's brief at 66.

Mother's assertions are belied by the record. At the July 11, 2019 hearing, Ms. Pecora testified that C.R. and T.R. told her they wanted to return to Mother and Father. N.T., 7/11/19, at 139, 173-74. At the January 17, 2020 hearing, however, Ms. Pecora testified that C.R. told her he wanted to stay with his foster parent. N.T., 1/17/20, at 72. At the January 19, 2021

- 8 -

hearing, Mr. Ismail testified that all four children told him they wished to be adopted. N.T., 1/19/21, at 26, 28-30.

At the March 15, 2021 hearing, Ms. Pecora testified that C.R. and T.R. go back and forth on whether they want to be adopted or return to the care of Mother and Father, *i.e.*, if they are having a good week with their foster parents, they want to stay there but if they are in trouble in the foster home, then they want to go back to Mother and Father. N.T., 3/15/21, at 14; *id*. at 55 (Mr. Ismail testifying to the same).

At the August 10, 2021 hearing, Attorney Graves represented to the court that he met with all four children in 2019, 2020, and 2021. Specifically as to C.R. and T.R., they both wanted permanent legal custody in 2019, but in 2021, C.R. still wanted permanent legal custody while T.R. wanted to be adopted. N.T., 8/10/21, at 22, 96. Attorney Blumenstein argued that the testimony of the CUA case managers evinced that C.R. wanted to be adopted and that the court should credit the ongoing relationship C.R. has with the CUA case managers over C.R.'s expressed desire to Attorney Graves. *Id*. at 96-97. During Mother's testimony, she conceded that C.R. and T.R. have vacillated between wanting to return to her and Father and wanting to be adopted by the foster parent. *Id*. at 25.

Finally, when the trial court inquired if all four children wished to be adopted, Attorney Blumenstein clarified that the CUA testimony indicated all

- 9 -

four children wanted to be adopted but Attorney Graves had represented that C.R.'s desires wavered. N.T., 9/1/21, at 7-8.

While Mother is correct that Attorney Graves did not ask questions or present evidence at the termination hearings, DHS presented evidence that C.R. and T.R. wavered in their desire to be adopted or return to Mother and Father, and the GAL extensively cross-examined all witnesses on behalf of the children. The record bears out that C.R. and T.R. have been indecisive about their preferences and often waffled depending on the circumstances at their foster home at the time. Given the changeable nature of their preferences, we cannot say that Attorney Graves failed to promote their legal interest.

Instantly, Attorney Graves told the court what the children's desires were at the beginning of the proceedings in 2019 and at the end of the proceedings in 2021. Given the equivocations of C.R. and T.R. about their desires, we cannot imagine how Attorney Graves could have advocated more zealously on their behalf. While Mother understandably wanted Attorney Graves to advocate more strenuously for their desire to return to her, such advocacy would have been disingenuous in light of the changing nature of the wishes of T.R. and C.R., who simultaneously expressed a clear desire to remain at the foster home through permanent legal custody or adoption. Based on the foregoing, we conclude that T.R. and C.R. were not deprived of their right to counsel during the termination proceedings.

Turning to Mother's remaining claims, we begin with our standard of review for matters involving involuntary termination of parental rights:

> The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized [the appellate court's] deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (cleaned up). "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." *In re M.G. & J.G.*, 855 A.2d 68, 73-74 (Pa.Super. 2004) (citation omitted). "[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." *In re Adoption of T.B.B.*, 835 A.2d 387, 394 (Pa.Super. 2003) (citation omitted).

Termination of parental rights is governed by § 2511 of the Adoption Act and requires a bifurcated analysis of the grounds for termination followed by the needs and welfare of the child.

> Our case law has made clear that under [§] 2511, the court must engage in a bifurcated process prior to terminating parental rights. Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in [§] 2511(a). Only if the court determines that the parent's conduct warrants termination of his

- 11 -

or her parental rights does the court engage in the second part of the analysis pursuant to [§] 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted).

At the outset, Mother complains she was not "given notice of the factual basis upon which the termination of her parental rights was predicated." Mother's brief at 38.[7] Mother compares a court's duty to "delineate the reasons for its decisions on the record in open court or in a written opinion or order" for custody matters, 23 Pa.C.S. § 5323(d), with a court's duty to "make a finding relative to the pertinent provisions of section 2511" following a termination hearing "and upon such finding may enter a decree of termination of parental rights[,]" 23 Pa.C.S. § 2513(d). According to Mother, "because [termination] findings must be based on a petition which 'shall set forth specifically those grounds and facts alleged as the basis for terminating parental rights,' the specificity requirement is even greater" in the termination context." Mother's brief at 43-44 (quoting 23 Pa.C.S. § 2512(b)(1)).

We do not agree with Mother's interpretation. Based upon the plain language of § 2513(d), the trial court was obligated to make a finding regarding the subsection(s) of § 2511 upon which it was granting termination.

_____

[7] Mother has waived any challenges to the adequacy of the underlying termination petitions as she did not raise any such objection in the trial court. *See* Pa.R.A.P. 302(a) ("Issues not raised in the trial court are waived and cannot be raised for the first time on appeal.").

Unlike in custody matters, § 2513(d) does not require a court to delineate the reasons for that finding, either in open court or in a written order or opinion. Here, the trial court listed the subsections pursuant to which it terminated Mother's rights both in open court and in the decrees themselves, and explained, in open court, that it considered who was performing the parental duties, the best interest of each child, and which party was likely in the future to be able to provide for the daily needs of the children. *See* N.T., 9/1/21, at 9-10. This was sufficient to satisfy the court's duty to "make a finding relative to the pertinent provisions of section 2511[.]" 23 Pa.C.S. § 2513(d).

Mother next argues that DHS failed to establish by clear and convincing evidence the statutory grounds for termination of her parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). Mother's brief at 44. We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (cleaned up). Termination is proper when the moving party proves grounds for termination under any subsection of § 2511(a), as well as § 2511(b). *T.B.B.*, *supra* at 395. To affirm, we need only agree with the trial court as to any one subsection of § 2511(a), as well as § 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*).

Here, we focus our analysis on § 2511(a)(1) and (b), which provide as follows:

**(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

. . . .

**(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511.

Our Supreme Court set forth the proper inquiry under § 2511(a)(1) as follows:

Once the evidence establishes a failure to perform parental duties or a settled purpose of relinquishing parental rights, the court must engage in three lines of inquiry: (1) the parent's explanation for his or her conduct; (2) the post-abandonment contact between parent and child; and (3) consideration of the effect of termination of parental rights on the child pursuant to Section 2511(b).

*In re Adoption of Charles E.D.M.*, 708 A.2d 88, 92 (Pa. 1998) (citation omitted). As it relates to timing, this Court further explained,

- 14 -

the trial court must consider the whole history of a given case and not mechanically apply the six-month statutory provision. The court must examine the individual circumstances of each case and consider all explanations offered by the parent facing termination of his or her parental rights, to determine if the evidence, in light of the totality of the circumstances, clearly warrants the involuntary termination.

*In re B., N.M.*, 856 A.2d 847, 855 (Pa.Super. 2004) (citations omitted).

Critically, though, the court is prohibited from considering any efforts made by a parent to remedy conditions **after** the filing of the petition to terminate. 23 Pa.C.S. § 2511(b).

The trial court addressed Mother's failure to perform parental duties as follows:

> The neglect, mental health, housing and parenting concerns that existed when the Children were . . . first adjudicated in 2016 and subsequently adjudicated again in 2018 continued to exist prior to the filing of the underlying petitions to terminate parental rights. These concerns were evidenced by Mother's mental health issues, which remained largely untreated as confirmed by [Ms. Pecora]. Ms. Pecora testified that the Children came into care due to parental neglect, inappropriate housing and concerns about the mental health of the parents. . . . Ms. Pecora testified that Mother's SCP objectives were to maintain appropriate housing and mental health treatment. Ms. Pecora testified that she had visited the home twelve (12) times and it was often unclean and not suitable for the family. . . .
>
> The testimony of Dr. Erica Williams, who conducted a [PCE] on both parents, confirmed that Mother and Father had not provided safety and permanency for the Children and were unable to remedy the issues which brought the Children into care.

Trial Court Opinion, 1/18/22, at 6-7 (citations omitted). In short, the court concluded that "[t]he evidence and testimony provided over the course of several hearings demonstrated that the Mother and Father had not

- 15 -

meaningfully engaged in their affirmative duties as parents" and "[a]lthough there was some indication that Mother and Father had recently obtained housing[,] there was little indication that this matter had been addressed in a timely fashion." *Id*. at 8.

Mother argues that the "six-month period and the totality of the case unambiguously and unanimously contradict the trial court's conclusory finding that Section 2511(a)(1) was satisfied." Mother's brief at 46. She assails the court's conclusion that her mental health issues were untreated because she began treatment five months before the termination petition was filed and was attending most of her sessions. *Id*. at 53-54. According to Mother, her inability to obtain services earlier was beyond her control and should not be held against her. *Id*. at 54-55 (citing § 2511(b) for the proposition that termination is not permitted solely on environmental factors beyond the control of the parent). As to the concerns about the cleanliness of her home, Mother claims that the alleged deficiencies were minor and resolved by January 2020. *Id*. at 47, 55-57. Mother attacks the court's reliance on the testimony of Dr. Williams and the 2017 PCE for terminating Mother's rights in 2021. *Id*. at 57-61. Additionally, Mother argues that the conditions leading to the placement of the children had been overcome given that the child born during the pendency of the termination proceedings remains in Mother's custody. *Id*. at 48. Finally, Mother contends the trial court's pinpoint citations to the transcripts of testimony do not support its conclusions. *Id*. at 55-56.

While Mother assails some of the pinpoint citations in the trial court opinion, the certified record supports the trial court's conclusions. Here, the relevant six-month period was from December 26, 2018 to June 26, 2019. Mother's main objectives since the beginning of the case have been mental health, PCE, housing, employment, and visitation. N.T., 7/11/19, at 176. Ms. Pecora testified that Mother was court ordered to follow the mental health treatment recommendations of the June 2017 PCE but did not enroll in mental health services until January 2019. *Id*. at 109, 120-21. Despite claiming that she could not obtain services earlier as a result of insurance issues, Mother took no measures to remedy the error during the one-and-a-half-year delay. Moreover, when she did finally engage, she failed to attend weekly or address the specific issues recommended by the PCE and did not attend consistently. Between January and July 2019, Mother attended six sessions and missed three. At the time of the July 2019 hearing, Mother had not attended a session in over a month and a half. *Id*. at 122-23, 129-31, 185-88.

With respect to housing, Ms. Pecora testified at the July 2019 hearing that she had visited Mother's new home on announced visits approximately twelve times since May 2018. She testified that sometimes the home was acceptable and sometimes it was not. Of specific concern to Ms. Pecora were the following: space for five children in two bedrooms when Mother was also pregnant, cigarette butts and ash on the floor, bugs on the walls, trash and food left around, a bad smell in at least one room, a full litter box, and animal urine and feces on the floor. *Id*. at 117-20, 179-80. Mother points to

testimony that these concerns had been alleviated by January 2020, and that the case managers found her housing appropriate at subsequent visits. ***See*** Mother's brief at 56. However, pursuant to § 2511(b), we cannot consider evidence of Mother's attempts to remedy the underlying concerns after the filing of the termination petition. Therefore, this testimony is of no moment under a § 2511(a)(1) analysis.

Finally, as to employment and visits during the relevant period, Mother only provided one paystub to Ms. Pecora in 2018 and never progressed to unsupervised visits. N.T., 7/11/19, at 189-90.

We are cognizant of the testimony that Mother made certain strides during the pendency of the termination proceedings. However, the relevant period for § 2511(a)(1) is **before** the filing of the termination petitions. More to the point, this Court has long recognized that a parent is required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities. ***In re A.L.D.*** 797 A.2d 326, 337 (Pa.Super. 2002). In this vein, "[a] parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." ***Id***. at 340 (citation omitted). As it relates to § 2511(a)(1), "[a] parent is required to exert a sincere and genuine effort to maintain a parent-child relationship; the parent must use all available resources to preserve the parental relationship and must exercise 'reasonable firmness' in resisting obstacles placed in the path of maintaining the parent-

- 18 -

child relationship." *In re C.M.S.*, 832 A.2d 457, 462 (Pa.Super. 2003) (citation omitted).

Mother's eleventh hour attempts to comply with her single case plan objectives that have been in place since 2016 are insufficient. "This court has repeatedly recognized that parental rights are not preserved by waiting for a more suitable or convenient time to perform one's parental responsibilities while others provide the child with his or her immediate physical and emotional needs." *Id*. (cleaned up).

Mother failed to assume parental duties for A.S., J.S., T.R., and C.R. for at least six months prior to the filing of the termination petition. She also failed to take efforts to overcome the alleged insurance obstacle in obtaining mental health services and when she did finally obtain services, her attendance was spotty and not in conformity with the PCE recommendations. Aside from a nine-month period when T.R. and C.R. were reunified with Father, all four children have been in foster care since 2016. Based on the foregoing, the trial court did not err in terminating Mother's parental rights as to each child pursuant to § 2511(a)(1).

Next, we consider whether the trial court committed an error of law or abuse of discretion pursuant to § 2511(b). As explained above, § 2511(b) focuses on the needs and welfare of the child, which includes an analysis of any emotional bond that the children may have with Mother and the effect of severing that bond. *L.M.*, *supra* at 511. The key questions when conducting this analysis are whether the bond is necessary and beneficial and whether

severance of the bond will cause the child extreme emotional consequences. *In re Adoption of J.N.M.*, 177 A.3d 937, 944 (Pa.Super. 2018) (quoting *In re E.M.*, 620 A.2d 481, 484–85 (Pa. 1993)). It is important to recognize that the existence of a bond, while significant, is only one of many factors courts should consider when addressing § 2511(b). *In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)). Other factors include "the safety needs of the child, and . . . the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent." *Id*.

Mother argues that the trial court "did not even give cursory consideration to the parent-child bonds the [c]hildren have." Mother's brief at 62. According to Mother, DHS failed to call the children's treating therapists and the court erred in relying on the unproven statements of the CUA case managers and foster parents as to the effect of termination on the children. *Id*. at 62-63. Additionally, she claims the trial court erred in failing to consider the sibling bond between C.R. and T.R. and the child born during the pendency of the proceedings. *See* Mother's brief at 49; Mother's reply brief at 15.

As a general matter, Pennsylvania does not require the orphans' court to enlist a formal bonding evaluation or base its needs and welfare analysis upon expert testimony. *In re Z.P.*, 994 A.2d 1108, 1121 (Pa.Super. 2011). "Common sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they

have a bond with their foster parents." ***In re T.S.M.***, ***supra***, at 268. In weighing the bond considerations pursuant to § 2511(b), "courts must keep the ticking clock of childhood ever in mind." ***Id***. at 269. "Children are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." ***Id***. A court cannot "toll the well-being and permanency" of a child indefinitely in the hope that a parent "will summon the ability to handle the responsibilities of parenting." ***In re C.L.G.***, 956 A.2d 999, 1007 (Pa.Super. 2008) (*en banc*) (citation omitted).

In relation to § 2511(b), the trial court cited Ms. Pecora's belief that termination was in the best interests of the children and that termination would not cause irreparable harm. Trial Court Opinion, 1/18/22, at 7. Based on its review of the record, the trial court found a bond existed between the children and their respective foster parents. ***Id***. at 8.

This assessment is supported by the certified record. At the termination hearings, J.A. testified to the positive changes for A.S. and J.S. since coming into her care. For J.S., he has become more independent, his reading has improved, he is very clean, and he feels worthy of love. N.T., 7/11/19, at 42-43. A.S. struggles and is nervous, but since coming into her care, both boys shower, change their clothes, brush their teeth, and wear deodorant and lotion. ***Id***. at 42, 44. Mother does not accompany either child to medical appointments or school meetings. ***Id***. at 40. In the time around visits with

Mother, both boys become anxious and defiant, and A.S. develops a rash. *Id*. at 19-22, 28-29. Ms. Pecora testified that J.S. is very affectionate towards J.A., they share a parent-child bond, and he looks to her for his daily needs. *Id*. at 168, 205. Ms. Pecora further testified that A.S. and J.S. do not have a healthy bond with Mother, do not want to visit with her, and do not want to return to her care. *Id*. at 169-70. K.J. is willing to adopt J.S. and J.S. wants to be adopted. N.T., 3/15/21, at 51. After moving to his new home, A.S.'s foster parents indicated that they are willing to adopt him and he wants to be adopted. N.T., 3/15/21, at 50. Neither J.S. or A.S. have attended visits with Mother since they changed the visits to occur at their sole discretion in 2019. *Id*. at 10-11. Finally, Ms. Pecora testified that termination would not result in irreparable harm to either boy. *Id*. at 14, 27-28; N.T. 7/11/19, at 170-71.

K.J. testified that T.R. and C.R. act out prior to visits with Mother and Mother does not attend medical appointments or school meetings. N.T., 7/11/19, at 61-62, 69-70. Since being in K.J.'s care, T.R and C.R. have excelled in school. *Id*. at 71. K.J. takes care of the boys' physical, emotional, and educational needs. *Id*. at 85-86. Ms. Pecora testified that T.R. and C.R. have a healthy bond with K.J. and "would be better off . . . educationally, housing-wise, stability-wise and care-wise" with him. *Id*. at 172, 174. She noted that T.R. and C.R. look to K.J. for their daily needs, not Mother. *Id*. at 207. Ms. Pecora further testified that termination would not result in irreparable harm to T.R. or C.R. N.T., 3/15/21, at 14, 27-28.

Thus, the certified record demonstrates that A.S., J.S., T.R., and C.R. are best served by terminating the parental rights of Mother in anticipation of adoption by their respective resource parents. Stated plainly, the children have thrived since entering care and the resource parents have provided stable, loving environments that provide structure and consistently have satisfied each child's developmental, physical, and emotional needs and welfare. Moreover, the record bears out that Mother does not have a healthy parental bond with A.S., J.S., T.R., or C.R., and that each child has formed a healthy bond with their resource parent. As such, the record supports the assessment of the trial court that termination is in the best interests of each child.

Finally, Mother argues that the trial court erred in relying on DHS's findings of fact attached to the petitions for goal change and a GPS report in its Rule 1925(a) opinion, as Mother claims these documents were outside the record. Mother's brief at 63-64. As discussed at length *supra*, the trial court's conclusions are supported by the certified record. Thus, even if we found that the trial court did rely on DHS's findings of fact and a GPS report and we found those items to be outside the record, Mother would not be entitled to relief as the court's conclusions are supported by the evidence of record. ***See in re Adoption of T.B.B.***, ***supra***, at 394 (citation omitted) ("[I]f competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result.").

- 23 -

Based on the foregoing, we affirm the decrees of the trial court terminating Mother's parental rights as to A.S., J.S., T.R., and C.R., as well as the orders changing each child's permanent placement goal to adoption.

Decrees affirmed. Orders affirmed.

Judge McLaughlin joins this Memorandum.

Judge Stabile files a Dissenting Memorandum.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 8/8/2022